Filed 11/29/21  Webster v. Webster CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WILLIAM WEBSTER et al., | |
| Plaintiffs and Appellants, | G059682 |
| v. | (Super. Ct. No. 30-2015-00816628) |
| ROBERTA LEE WEBSTER, as Trustee, etc., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Jacki C. Brown, Judge.  Affirmed.

Law Offices of Barron E. Ramos and Barron E. Ramos for Plaintiffs and Appellants.

John Anderson Law and Todd C. Anderson for Defendant and Respondent.

**INTRODUCTION**

This case presents the type of sad situation we see too often for comfort – family members locked in acrimonious litigation. Appellants William Webster and his sister, Cynthia Lazzaro, challenged their mother's actions as trustee over property and funds following the death of their father. William and Cynthia's[1] mother, respondent Roberta Webster, undertook litigation of her own, attempting to evict William from trust property and seeking its partition. In the end, the three of them were left only with a set of relationships damaged probably beyond repair – or, in the words of the trial court "the complete disintegration of a family following the demise of the patriarch."

In this appeal, however, our focus is narrow. William and Cynthia do not challenge the substance of the court's judgment, but rather the ruling denying their separate petition for attorney fees under Probate Code section 17211, subdivision (b).[2] Given our deferential standard of review, we find no error.

**FACTS**

Roberta, a special education teacher, and her husband Walter, an attorney, had three children: David (who predeceased his parents) Cynthia, and William.[3] Walter handled all of the family's finances and did not share much of what he knew with anyone else. As the "keeper of the keys," Walter also apparently did not mind being in control of his children's financial lives. When Cynthia became a young widow, Walter assisted her in purchasing a property in San Clemente in 1997 – referred to by the parties as the Mastil property – by obtaining a mortgage loan in his own name. According to Cynthia, she gave her father part of the down payment. And Walter told her that if she paid him a certain amount of money to cover the mortgage and paid the homeowners association

---

[1] We refer to the parties by their first names for ease of reference. We mean no disrespect.

[2] All further statutory references are to the Probate Code.

[3] We take many of the background facts from the probate court's statement of decision since neither side disputes its accuracy regarding the facts.

fees, the Mastil property would belong to her once the mortgage was paid off. Neither of them documented the agreement.

William had a similar tale to tell. Walter had agreed to assist him in purchasing his own home in 1993. This property, also in San Clemente, is referred to as the Balandra property. William provided no money to fund the down payment and could not qualify for a mortgage due to bad credit, so his father offered to pay the $20,000 down payment and obtain a mortgage. In exchange, William was to pay Walter a certain amount per month to cover the mortgage, and after the loan was paid off, title would transfer from Walter and Roberta to William. If he sold the home, he would have to repay the amount of the down payment from the proceeds. As with Cynthia's agreement, there were no documents memorializing this agreement.

William and his family occupied the Balandra property after it was purchased, and Cynthia and her two children moved into the Mastil property after its purchase. In 1998, the siblings decided to switch homes because the Mastil property would provide more room for William's larger family. Thus, since 1998, William has occupied the Mastil property, and Cynthia has occupied the Balandra property.

While Roberta was not directly involved in the discussions between her husband and the children, she and Walter had discussed the properties in question, and she knew Walter had never intended to gift either of them to Cynthia or William. Rather, the intent, at least with William, was to enable him to purchase a home; but until the purchase was completed, the property belonged to her and Walter.

Neither William nor Cynthia were able to fully perform their end of the agreements they alleged existed. Cynthia stopped making payments on the Mastil property in 2001, causing her parents to pay off the balance of the mortgage – about $133,000 – in 2003. William also could not maintain his payments to Walter, even after Walter agreed to reduce them when Williams' wife left him. (Roberta and Walter were so fearful this might happen that they had paid the mortgage off early in 1994.)

3

William and Cynthia were closer to their father than their mother. And in 2006, after Walter passed away, the relationship between Roberta and her children began to deteriorate. In 1998, Roberta and Walter had created a revocable living trust to benefit them during their lifetimes. At the time it was signed, they assigned all of their assets into the trust, and Walter granted Roberta power of attorney to transfer all assets or interests of his into the family trust. As Walter was nearing the end in 2006, she initiated said transfer. This included the Balandra property and her and Walter's interest in the Mastil property.[4]

Roberta's transfer of the Balandra property angered William, who had always considered the property his. He had expected to be able to take out a mortgage on it to help fund his son's college education, and he believed such an option would no longer be available if the trust owned the property.

After Walter's death, Roberta expended over $400,000 over eight years on the grandkids' college expenses, helping Cynthia finance post-graduate studies, paying off credit cards, funding repairs and vacations, and paying medical and clothing expenses. These monies came from her survivors' trust and death benefits from Walter's life insurance policy rather than from decedent's trust funds. Additionally, Roberta produced evidence that she and Walter, not William and Cynthia, had paid nearly $300,000 for property taxes, down payments and homeowners association fees on both the Mastil and Balandra properties. In the trial court's view, William and Cynthia "became so reliant on constant funds from their parents, they never developed any skill or ability to be self-sufficient or responsible."

Roberta began to ask her children to start chipping in on expenses for the Mastil property. But they did not do so. By this time, William had stopped making

___

[4] The record reflects Cynthia was on the title of the Mastil property, and the trial court considered her part owner, rather than full owner, as she claimed.

payments on the Balandra property as well.[5]  In 2014, she demanded he begin to pay rent for his continued residence at the Mastil property.  He did so for about two years, totaling about $9000.  But ultimately, Roberta filed unlawful detainer actions against him.  She was unsuccessful only because Cynthia opposed evicting her brother from the property of which she was part owner.

On October 22, 2015, William filed a petition to compel Roberta to divide the trust's assets and to provide an accounting.  Two years later, he amended the petition, seeking to recover the Balandra property from the trust estate based on his alleged agreement with Walter.  He sought attorney fees as part of his claims.

Separately, in January 2016, Roberta filed a partition action against Cynthia regarding the Mastil property.  The partition action was eventually consolidated and coordinated with William's petition.  Roberta also sought approval of her accounting for the trust, to which the children objected.  She too sought reimbursement of her attorney fees.

After a bench trial, the court issued a ruling and statement of decision on all of the pending actions.  William's petition to recover the Balandra property was denied because he failed to establish the agreement with his father.  The Mastil property was purchased by his parents and Cynthia, and the Balandra property by Walter and Roberta, and Roberta was within her discretion as trustee to transfer the couple's interests in these properties into the trust.  The court denied Roberta's request for partition of the Mastil property because it was never clearly established whether title was held in a joint tenancy and she did not establish whether she gave notice to the others on title to contribute their fair share toward ownership costs.

The court also found Roberta had breached her fiduciary duties as trustee by failing to communicate with her children about the business and status of the trust,

---

[5]     He said Roberta told him to stop making them until she got the accounts straightened out,

5

failing to provide them with a copy of the trust document and taking actions benefiting her at their expense, such as undertaking litigation against them. The accounting was not approved because it did not start in December 2006, which was the month Walter died and trusteeship passed to her alone. Instead, it started in 2009.

Perhaps most tellingly, the court felt Roberta could not remain as trustee because her relationship with William and Cynthia was so bitterly contentious. It ordered her to provide the missing accounting after which it would appoint a private fiduciary to take on the role. And, mindful of the antipathy between mother and children, it ordered the parties to undertake any pursuit of attorney fees and costs by way of a separate petition.[6]

William and Cynthia did so. Roberta filed her own separate motion. The trial court denied both sides any attorney fees or costs, saying: "As there was no prevailing party in the trial of the three consolidated petitions, and no factual disputes as to the requested fees and costs, this court can easily resolve this dispute without further ado." It went on to determine that attorney fees under section 17211, subdivision (b) were inappropriate.

## DISCUSSION

For a case with so many layers, the actual legal issues are remarkably clear-cut. Section 17211, subdivision (b) states in pertinent part: "If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was *without reasonable cause and in bad faith*, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred to contest the account." (Italics added.) According to William and Cynthia, the trial court erred because it applied a prevailing party standard to determine entitlement to

---

[6] Essentially, the trial court felt a hearing would be so rancorous that it could not take place on the law and motion calendar.

attorney fees rather than the standard provided in section 17211, subdivision (b). This argument is simply wrong, and even a cursory review of the ruling reveals it to be so.

True, the trial court observed that neither side prevailed. But that was not the basis for its ruling. The trial court recognized it had discretion under section 17211, subdivision (b) to award fees and costs to Cynthia and William, but it also recognized the limitations on its discretion: "Although the trial court holds the discretion to award attorney's fees and costs to a *successful* beneficiary who contests a trustee's action IF that trustee responds 'without reasonable cause and in bad faith,' [citation], that is not the situation in the case at bar. It is true that the trustee's accounting was not approved because it lacked the first years' transactions, but the trustee's contesting the beneficiaries' petitions was *not* in bad faith." We are not sure how much plainer the trial court could have made it.

To the extent William and Cynthia argue Roberta's removal as trustee implies bad faith on her part, the trial court addressed this issue as well: "The trustee breached her fiduciary duty to provide an accurate and thorough account, but, as already stated, that was *not* the reason for the removal. She was removed because all three family members failed to act reasonably towards one another, and the two beneficiaries were as much 'at fault' for this failure as was the trustee." In short, the trial court did not apply a prevailing party standard to reach its final ruling. It applied the correct standard under section 17211, subdivision (b), and we see no reason to reverse it.

Perhaps the parties' time would have been better spent contemplating the trial court's lament: "The Court recognizes this ruling will drive a nail in the coffin of this family's relationship. On the other hand, the endless number of vituperative statements flung between the three already annihilated any vestige of love or affection. Roberta will age, alone and without comfort, and both her children will digress into resentful, unproductive individuals, unless all three of them choose to repair this very sad scenario

7

with mutual respect and concern."  This would be the best recompense for all the time and treasure expended in this lawsuit.

## DISPOSITION

The judgment is affirmed.  Respondent to recover her costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


GOETHALS, J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.